## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

      Case No. 17-40007-01-DDC

BRUCE MAYO NICHOLS, II (01),

      Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Bruce Mayo Nichols, II's Motion to

Suppress (Doc. 17).  In his motion, Mr. Nichols asserts that law enforcement officers violated his

Fourth and Fifth Amendment rights.  He asserts that Topeka Police officers violated his Fourth

Amendment rights by unlawfully seizing him during a traffic stop and then, searching him and

the truck he was driving.  He also asserts that officers violated his Fifth Amendment rights by

eliciting incriminating statements from him without first informing him of his *Miranda*[1] rights.

Mr. Nichols's motion thus seeks to suppress any evidence derived from the unlawful seizure and

searches.  The motion also seeks to suppress evidence of any incriminating statements Mr.

Nichols made before law enforcement officers informed him of his *Miranda* rights.  The court

took this motion under advisement after a hearing on November 17, 2017.  For reasons explained

below, the court now denies the request to suppress evidence derived from the seizure and

searches, but grants the request to suppress evidence of incriminating statements.

---

[1]    *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

## I.    Background[2]

In the late afternoon, on November 29, 2016, three members of the Topeka Police

Department Bicycle Unit—Officer James Schneider, Officer Justin Long, and Sergeant Jayme

Green—were stationed behind a hedgerow at the entrance to the strip mall at the corner of 17th

and Washburn Streets in Topeka, Kansas.  While positioned there, Officer Schneider saw the

driver of a red Chevrolet pickup truck with a bed topper driving without a seatbelt.  He also saw

that the truck had expired registration.  Tr. of Nov.17, 2017 Mot. Hr'g at 51 [hereinafter Tr. of

Hr'g].  He informed Officer Long and Sergeant Green of his observation, and the officers

initiated a traffic stop.  *Id.* at 9–10.  The three officers pedaled after the red truck and caught it as

the truck parked.  As Officer Long reached the driver's-side door, the driver—who they soon

learned was Mr. Nichols, the defendant here—started to get out of the truck.  Officer Schneider

reached the passenger's-side door of the truck a moment or two later.  And almost immediately,

he came around the truck to assist Officer Long at the driver's-side door.  Sergeant Green arrived

as Officer Schneider walked around the truck to assist Officer Long.

There was some confusion as the officers' interaction with Mr. Nichols began because

Mr. Nichols already had started to leave the vehicle when Officer Long arrived.  So Officer Long

ordered him back in the vehicle.  Officer Long's body camera captured a situation that was

unclear for several moments.  Ex. 1 (video identified on Ex. 1 as Long #1.mp4 at 00:30–00:39).

It appeared that Mr. Nichols was unsure whether Officer Long wanted him to get back into the

truck or remain outside it.  *Id.*  Officer Long testified that he viewed Mr. Nichols's conduct as

non-compliant so he handcuffed him.  Tr. of Hr'g at 16–17.  Nine seconds passed between

---

[2]    The court takes the background facts from the officers' testimony, to the extent credible, and the body
camera footage in Exhibit 1 presented at the November 17, 2017 hearing.

Officer Long's order for Mr. Nichols to get back into the truck and Officer Long handcuffing him.

At that point, Mr. Nichols began asking why he was being handcuff. Officers Long and Schneider responded nearly simultaneously: "Because you don't want to listen,"[3] and "Because you were getting out of your car when we wanted to talk to you."[4] Ex. 1 (Long #1.mp4 at 00:39–00:46). Then they began to search Mr. Nichols. And they quickly determined he did not have identification on him. During this period, Mr. Nichols asked the officers to close the truck's door on the driver's side 10 times. They refused. While Officers Long and Schneider searched Mr. Nichols, two more officers from the bicycle unit—Officers Jones and Ralston—arrived. Five officers were now on-scene. When Officers Long and Schneider finished searching Mr. Nichols, Officer Long directed him to sit on the curb next to his truck.

While Mr. Nichols sat on the curb, Officer Jones stood over him as Officer Schneider asked him his name. Later, after Mr. Nichols said and spelled his name several times, Officer Schneider finally recorded "Bruce Mayo Nichols, II." While Officer Schneider was trying to get Mr. Nichols to supply his name, Sergeant Green picked up Mr. Nichols's keys[5] and opened a container attached to the keys. Ex. 1 (J. Green #2.mp4 at 02:30–03:05). Sergeant Green testified that the container smelled like marijuana. Tr. of Hr'g at 103–04. And he saw crumbs of green,

---

[3]    This was Officer Long's response.

[4]    This was Officer Schneider's response.

[5]    It is unclear from the video footage taken from the officers' body cameras or the officers' testimony during the November 17, 2017 hearing how the keys with the attached container ended up on the ground. *See* Tr. of Motion Hr'g at 23. Officer Long testified that he believed he or Mr. Nichols had dropped them there. *Id.* at 44. Officer Long also testified that Officer Schneider could have removed them from Mr. Nichols's hand and dropped them. *Id.* (testifying that it is common practice to remove all items from a suspect's hands before handcuffing them).

leafy vegetation inside it. *Id.* Sergeant Green handed the container to Officer Long, and he testified that he smelled marijuana also. Tr. of Hr'g at 22.

Once Officer Long smelled the container, he walked over to Mr. Nichols and asked him: "Is there any weapons in the car I need to be concerned about? For my safety is there any weapons I need to know about?" Ex. 1 (Long #1.mp4 at 03:27–03:40). Mr. Nichols did not respond. Meanwhile, Sergeant Green started searching the truck. And Officer Long began to search as well. During their search of the truck, officers testified, they found two loaded guns, drugs, and drug paraphernalia. Tr. of Hr'g at 24.

While Sergeant Green and Officer Long searched the truck, Officer Jones began asking Mr. Nichols more questions. First, he asked: "Bruce, it's just an expired tag, man. What is there to be upset about?" Then, he asked who the truck belonged to and whether Mr. Nichols was on probation or parole. Mr. Nichols responded that he was on probation, but he was going to go back. Officer Long then asked, "What do you think you're going back for?" When Mr. Nichols explained that he was around things he wasn't supposed to be, Officer Long resumed questioning: "Are you talking about firearms or are you talking about drugs?" Mr. Nichols responded that he was talking about guns. Ex. 1 (Jones #1.mp4 at 02:20–03:45). During these questions, Officer Ralston stood nearby. Officer Jones asked one more question and then walked back to the truck to tell Sergeant Green and Officer Long: "[Mr. Nichols] says there are two firearms in the vehicle." *Id.* at 03:55–04:00.

As Officer Jones walked back to Mr. Nichols, Mr. Nichols started talking about drugs in the truck. Officer Jones continued to prompt Mr. Nichols with clarifying questions. *Id.* at 04:00–06:11. Officer Jones continued that questioning for another two minutes. *Id.* Officers

never informed Mr. Nichols of his *Miranda* rights during this interaction, which lasted almost 30 minutes.

Mr. Nichols's motion now seeks to suppress all evidence derived from the officers' search of the truck and the container attached to his keys. He also seeks to suppress evidence of any incriminating statements that Mr. Nichols made before he was informed of his *Miranda* rights.

## II.     Analysis

Mr. Nichols asserts that the officers violated his Fourth and Fifth Amendment rights. The court addresses the officers' alleged transgressions below.

### A.     Fourth Amendment

The Fourth Amendment[6] forbids unreasonable searches and seizures. *California v. Carney*, 471 U.S. 386, 390 (1985). If the defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove the reasonableness of that search or seizure by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). If the court determines that a search or seizure violated the constitution, the exclusionary rule prohibits admission of the fruits of all evidence seized illegally. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

Mr. Nichols asserts that the court should suppress evidence of drugs found in the container on his keychain because it was an improper warrantless search. Doc. 18 at 6–10. Mr. Nichols also asserts that the court should suppress evidence of the drugs, drug paraphernalia, and guns found in the truck that Mr. Nichols was driving because the police officers lacked probable

---

6     "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV

cause to arrest Mr. Nichols or search his vehicle. *Id.* at 10–16. The court concludes that officers had probable cause to arrest Mr. Nichols and this allowed them to search the container. The result of the search of the container gave them probable cause to search the truck.

### 1.    Probable Cause to Arrest

Beginning with Mr. Nichols's seizure, probable cause justified that seizure. "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008). Officers Long and Schneider stopped Mr. Nichols for failing to have valid registration and not wearing a seatbelt. In Kansas, failing to have valid registration is a misdemeanor offense, Kan. Stat. Ann. § 8-149, and law enforcement officers have discretion to arrest a driver for a misdemeanor offense, *id.* § 8-2104(b). Officer Schneider saw Mr. Nichols driving the car with an expired registration and thus had probable cause to believe that he had violated § 8-149. Officer Schneider relayed his observation to Officer Long before the stop, giving him probable cause to believe a violation had occurred as well. It was within their discretion to arrest Mr. Nichols.[7]

### 2.    Search Incident to Arrest

When there is a valid arrest, law enforcement may search incident to that arrest. The Supreme Court has found that:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in

---

[7]    Mr. Nichols argues that the police improperly arrested him by converting a valid investigative detention into an arrest without the requisite probable cause. Doc. 18 at 11–12. He argues that the police converted the detention to an arrest by using an unreasonable degree of force and unreasonably prolonging the detention. *Id.* at 12–16. The court does not address these arguments because it finds that Officer Long had probable cause to arrest Mr. Nichols for failing to have valid registration on the truck, thus nullifying Mr. Nichols's arguments.

> order to resist arrest or effect escape.  Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.  In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.  And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule.

*Chimel v. California*, 395 U.S. 752, 762–63 (1969).  The Supreme Court and the Tenth Circuit have held that a search incident to arrest includes personal property "immediately associated" with the person arrested.  The guiding principles for determining if the personal property is "immediately associated" with the arrestee is the time and location of the search in relation to the arrest.  *United States v. Chadwick*, 433 U.S. 1, 15 (1977) (holding that the search of an arrestee's person and personal property immediately associated with the arrestee may be conducted without a warrant, but warrantless searches of personal property cannot be justified as incident to the arrest if either the search is remote in time or place from the arrest).  In *Chadwick*, the search of a 200-pound footlocker in the federal building an hour and a half after the arrest was not a proper search incident to arrest.[8]  *Id.*

The Tenth Circuit applied these principles in *United States v. Herrera*, 810 F.2d 989 (10th Cir. 1987).  In *Herrera,* postal investigators conducted an operation designed to catch a postal worker stealing letters containing food stamps.  810 F.2d at 989.  During the operation, investigators observed the defendant take a letter containing a tracking device—which the investigators had planted so the defendant would find it—and put in his briefcase.  *Id.* at 990.  As the defendant left the postal facility with his briefcase and the planted letter, the investigators followed the defendant to the parking lot where they stopped him.  *Id.*  They took the briefcase

---

[8]    Before the Supreme Court established these guiding principles in *Chadwick*, it found that a crumpled cigarette pack that was removed from the defendant's person and immediately searched was a proper search incident to arrest.  *See United States v. Robinson*, 414 U.S. 218 (1973).  This search incident to arrest adheres to the principles later described by *Chadwick*.

from the defendant and escorted him back to the postal facility.  *Id.*  Once back inside the postal

facility, the investigators searched the defendant's briefcase.  *Id.*  The Tenth Circuit found that

the search of the briefcase "was well within the time, control, and place constraints" established

by the Supreme Court in *Chimel*, *Chadwick*, and *New York v. Belton*, 453 U.S. 454 (1981)

(applying the time, control, and place constraints to a search of containers inside a car's

passenger compartment).  *Id.* at 990–91.

      Here, the officers' search of the container attached to Mr. Nichols's keys was within the

time, control, and place constraints for the search of an arrestee's personal property incident to

arrest.  Mr. Nichols had the keychain in his exclusive control when he got outside the truck he

had been driving.  He then was handcuffed and the keys dropped to the ground.  Within two

minutes of Officer Long handcuffing Mr. Nichols, Sergeant Green picked up the keychain with

the container and searched the container.  Ex. 1 (J. Green #2.mp4 at 00:48–2:42).  When

Sergeant Green searched the container, Mr. Nichols was less than 10 feet away.  Using the

principles established by *Chadwick* and amplified by *Herrera*, the court concludes that the

container on Mr. Nichols's keychain was "immediately associated" with him.  And so, the search

of the container was a valid search incident to arrest.  For this reason, the court overrules the

motion to suppress the evidence found during the search of the container.

### 3. Search of the Truck

      Last, the odor of unburnt marijuana detected by Sergeant Green during his search of the

container and the context of the circumstances provide probable cause to search inside Mr.

Nichols's truck.  Law enforcement may search an automobile during a traffic stop without a

warrant "if probable cause exists to believe that contraband or evidence of criminal activity is

located inside."  *United States v. Baylor*, No. 06-40099-01-RDR, 2006 WL 3146348, at *2 (D.

Kan. Oct. 31, 2006) (citing *Chambers v. Maroney,* 399 U.S. 42 (1970); *Carroll v. United States,* 267 U.S. 132 (1925)).  Sergeant Green testified that when he searched the container, he detected an odor of unburnt marijuana emanating from the container.  Tr. of Hr'g at 103–04.  He asked Officer Long to smell the container as well.  *Id.* at 22.  Officer Long confirmed that it smelled like marijuana.  *Id.*  Sergeant Green also testified that he saw crumbs of green, leafy vegetation inside the container.  *Id.* at 103–04.  The odor of marijuana and presence of "vegetation crumbs" established probable cause to believe that contraband or other evidence of criminal activity was located inside the truck.

There was additional testimony from Sergeant Green during the November 17, 2017 hearing that the court does not rely on in its conclusion that probable cause existed to search the truck.  First, Sergeant Green testified on direct examination that he smelled an odor of marijuana emanating from the truck.  Tr. of Hr'g at 99–100.  After the cross examination of Sergeant Green, however, it was unclear whether his statement—"this smells like weed"—referred to the container or the interior of the truck.  *Id.* at 114–20.  The court is not persuaded that any of Sergeant Green's statements at the scene—as captured by his body camera and the other officers' body cameras—suggest that Sergeant Green told the other officers:  (a) that the truck smelled like marijuana; or (b) that he asked them to verify the smell coming from the truck.

Sergeant Green's report dated December 1, 2016—filed just two days after Mr. Nichols's arrest—fails to note that he smelled marijuana emanating from the interior of the truck.  *Id.* at 122–23.  Instead, about two months later on February 3, 2017, Sergeant Green wrote an amended report.  This amended report included the assertion that he smelled marijuana coming from inside the truck.  Sergeant Green conceded that he amended his report after a DEA task force officer had called him and asked when he first smelled marijuana.  *Id.* at 123–27.  The court does

9

not find this assertion sufficiently credible, and so its analysis does not rely on Sergeant Green's testimony on this point.

Finally, Officers Long and Schneider testified that they did not smell marijuana in the truck. *Id.* at 22, 24, 35 (Officer Long testifying that he did not smell marijuana while he was cuffing Mr. Nichols next to the open truck door or while he was searching the truck); *Id.* at 67 (Officer Schneider testifying that he did not smell marijuana while he was standing next to the open truck door). Under the circumstances, the court finds Officers Long and Schneider's testimony more persuasive. For these reasons, the court's conclusion that probable cause existed to search the truck does not rely on Sergeant Green's testimony that an odor of marijuana emanated from the truck.

Sergeant Green also testified on direct examination that he observed a white vitamin bottle and a jeweler-sized plastic bag with a crystalline-like substance inside the truck in plain view. *Id.* at 105–06. But again, he omitted these observations from his December 1, 2016 report. His February 3, 2017 report included them, however. *Id.* at 123. The white vitamin bottle can be seen clearly in the pocket of the driver's-side door on Sergeant Green's body camera footage. Ex. 1 (J. Green #2 at 01:45–02:15). Nothing about the appearance of this vitamin bottle suggests it contains contraband or other evidence of criminal activity. Indeed, it looks like a vitamin bottle. A vitamin bottle inside a car does not help support probable cause.

The plastic bag, however, cannot be seen clearly on Sergeant Green's body camera footage. But Sergeant Green testified on direct examination:

> It was also—the car was kind of messy. There was a lot of stuff inside the cab of the truck. In the center console area there was a small baggie. Not a food size Ziplock type bag but like a jeweler size. Almost—almost anytime we see those in car stop situations they have drugs in them. And there was a white or crystalline kind of powder substance. I couldn't see the substance very well but I could see

10

> the top of the bag enough to know that it was a jewelry sized Ziplock baggie and there was some sort of powder or—even went into the car.

Tr. of Hr'g at 105–06.  When asked on cross examination where in the center console the baggie was located, he testified, "There was just—he had a lot of—just a pile of stuff and it was kind of mixed in with that pile of stuff at the top and I could really just see the top of it."  *Id.* at 121.

It is unclear from this testimony whether Sergeant Green could see a crystalline-like substance in plain view or merely the top of the bag.  Like the vitamin bottle, the top of a plastic bag does not suggest it contains contraband and cannot add to the probable cause determination.  Again, the court is not persuaded to accept the accuracy of a report written two months after the arrest over the accuracy of a report written two days after the arrest.  For these reasons, the court does not rely on Sergeant Green's testimony about a white vitamin bottle and a jeweler-sized plastic bag with a crystalline-like substance in the truck in plain view to conclude that probable cause existed to search the truck.

Instead, the court determines that the odor of marijuana and presence of vegetation crumbs in the container on Mr. Nichols's keys established probable cause for the officers to believe that contraband or other evidence of criminal activity was located inside the truck.  It is well-settled in our Circuit that the distinct odor of burnt marijuana coming from the window of a stopped vehicle—by itself—provides probable cause to search the entire passenger compartment of the vehicle.  *United States v. Nielsen*, 9 F. 3d 1487, 1491 (10th Cir. 1993); *see also United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015).  Here, however, the court does not have sufficient evidence to determine that the odor of marijuana emanated from the truck.  Instead, there is sufficient evidence to determine the container on the keychain smelled like marijuana.  The parties do not cite and the court cannot find any case where the Circuit has decided whether the odor of marijuana emanating from a container immediately associated with an arrestee during

11

a traffic stop provides probable cause to search the detained vehicle.  But the Eighth Circuit has

addressed a related issue in *United States v. Caves*, 890 F.2d 87 (8th Cir. 1989).

In *Caves*, a law enforcement officer smelled the odor of burnt marijuana on the

defendant's person and breath during a traffic stop.  890 F.2d at 90.  The Eighth Circuit held that

this perception was sufficient to provide probable cause for a warrantless search of the car—both

the passenger compartment and the trunk—for unburnt marijuana.  *Id.* at 91.  The Circuit based

its reasoning on decisions by several Circuits—including ours—that rely on "the odor of

marijuana in determining that probable cause existed for a warrantless automobile search."  *Id.* at

90 (citing *United States v. Loucks*, 806 F.2d 208 (10th Cir. 1986) (finding that probable cause

existed where officers stopped an automobile for speeding, the driver was "reeking" of marijuana

as he sat in patrol car, and the officer smelled what he thought was still-burning marijuana in his

detained vehicle) (other citations omitted)).

The *Caves* defendant tried to distinguish those cases from his on two grounds:  (1) the

odor of unburnt marijuana provided probable cause in many of the cases, and (2) in all of the

cases, "the officer detected the marijuana odor emanating from not only the driver, . . . but also

from inside the automobile itself."  *Id.* at 91.  The Eighth Circuit rejected this argument:

> Although the odor of burnt marijuana on the driver alone is undoubtedly less
> probative of the existence of unused marijuana in the automobile than would be
> the odor of unburnt marijuana emanating from both the driver and the vehicle, we
> are unable to conclude that the odor of burnt marijuana on Caves's breath and
> person, when considered in the context of the circumstances confronting the
> trooper, was insufficient to establish probable cause for the search of the
> automobile.

*Id.*  The Eighth Circuit explained what it meant by this reference to "the context of the

circumstances" by listing two facts.  First, the officer knew that the defendant had been travelling

for hundreds of miles.  *Id.*  The court determined that this fact made it reasonable for the officer

to conclude that the defendant or his co-defendant had smoked marijuana in the vehicle.  *Id.*

12

Second, the defendant left the automobile to meet the officer rather than waiting inside the vehicle and rolling down his window. *Id.* The court reasoned that the defendant "may have been trying to prevent the patrolman from plainly observing, or detecting the odor of, marijuana in the interior of the automobile." *Id.* In light of totality of these circumstances confronting the trooper, the Eighth Circuit concluded that he had probable cause to believe that unused marijuana was still present in the defendant's automobile. *Id.*

Although some of the facts are different here, when the court applies the reasoning from *Caves*, it supports the same result. Sergeant Green and Officer Long detected an odor of unburnt marijuana emanating from the container attached to Mr. Nichols's keys. They also observed vegetation crumbs in the container. Similar to *Caves*, the officers smelled marijuana outside the car. This is the most significant similarity between these facts and the circumstances of the traffic stop in *Caves*: the odor of marijuana emanated from a location other than the vehicle.

In *Caves*, the odor was of *burnt* marijuana. But the Eighth Circuit determined that the context of the circumstances provided probable cause to believe that *unused* marijuana was still present in Caves's automobile. *Id.* Here, the odor was of *unburnt* marijuana, and *Caves*'s analysis suggests such an odor is more probative. *See Caves*, 890 F.2d at 91 ("The odor of burnt marijuana on the driver alone is undoubtedly less probative of the existence of unused marijuana in the automobile than would be the odor of *unburnt* marijuana emanating from both the driver and the vehicle." (emphasis added)). Also, the context of the circumstances here, suggests that Mr. Nichols—like the defendant in *Caves*—had unburnt marijuana in the truck and he was trying to prevent the officers from plainly observing or detecting that marijuana was in the truck when he repeatedly asked the officers to close the truck's door.

13

This odor of unburnt marijuana emanated from the container on Mr. Nichols's keys. Keys are instruments closely associated with a car.  Indeed, keys or some similar instrument are required to operate a car.  And, in this case, Mr. Nichols used the keys to operate the truck moments before they were dropped on the ground.  When the odor of marijuana emanated from an instrument closely associated with the truck, it suggested that the truck contained marijuana. So, based on this odor and the presence of vegetation crumbs, it was reasonable for the police officers to believe that they would find contraband or other evidence of criminal activity inside the truck.

Also, the evidence that the government presented during the November 17, 2017 hearing suggests that Mr. Nichols may have tried to prevent the Topeka Police officers from plainly observing, or detecting the odor of, marijuana in the truck.  After Officer Long handcuffed Mr. Nichols, Mr. Nichols frantically asked the officers to close the driver's-side door.  He asked 10 separate times in a two-minute period.  Ex. 1 (Long #1.mp4 at 01:00–03:00).  Each time the officers told Mr. Nichols they would not close it.  But he persisted.  This insistence suggests that he believed officers could see or smell marijuana and he was trying to prevent its detection.

In light of the totality of the circumstances confronting the Topeka Police Department officers, the court concludes that they had probable cause to believe that unused marijuana was present in the truck Mr. Nichols was driving.  The court thus denies the part of Mr. Nichols's motion that seeks to suppress evidence found during the truck search.

### B.    Fifth Amendment

Mr. Nichols next asks to suppress evidence of incriminating statements he made because the Topeka Police officers failed to inform of his *Miranda* rights before conducting custodial interrogation.  The Fifth Amendment to the United States Constitution guards individuals from

being compelled to incriminate themselves. U.S. Const. amend. V.  To ensure that people

understand this guarantee, the Supreme Court established procedural safeguards that police must

satisfy before questioning a person. *Miranda*, 384 U.S. at 444.  These safeguards take the form

of *Miranda* warnings—a proactive recitation of rights that police must deliver.  An officer does

not need to perform this incantation before he asks any question of any person.  But the officer

must give it before commencing a custodial interrogation of the suspect.  *Id.* at 444.  Thus, to

determine whether police should give a person *Miranda* warnings, courts consider two factors:

(1) whether the person was in custody and (2) whether the police interrogated him.

### 1.    Custody

A person is in custody for *Miranda* purposes "when he has been arrested or his freedom

is curtailed to a degree associated with a formal arrest."  *United States v. Cronin*, 540 F. Supp. 2d

1189, 1191 (D. Kan. 2008) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); *California

v. Beheler*, 463 U.S. 1121, 1125 (1983)).  In other words, a person is in custody when he is

arrested or subjected to circumstances that are "the functional equivalent of [a] formal arrest."

*Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  Here, the court already has concluded that

probable cause existed to arrest Mr. Nichols, allowing a search incident to arrest.  But the court

did not decide whether Mr. Nichols, in fact, was arrested for Fourth Amendment purposes.  The

court turns to that issue now.

To determine if a person is subjected to circumstances that are the functional equivalent

of a formal arrest, "[c]ourts must examine 'all of the circumstances surrounding the

interrogation' and determine 'how a reasonable person in the position of the individual being

questioned would gauge the breadth of his or her freedom of action.'"  *Yarborough v. Alvarado*,

541 U.S. 652, 663 (2004) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).  The

Tenth Circuit has identified a non-exhaustive list of factors to guide evaluation of the circumstances: (1) "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will;" (2) "'the nature of questioning,' where 'prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave;'" and (3) "whether police dominate the encounter." *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (quoting *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993)).

Here, the court finds that Mr. Nichols was in custody because a reasonable person in his situation would not have felt free to leave, or even stop answering questions. Within moments of leaving his truck, Mr. Nichols was placed in handcuffs and the police dominated the encounter from that point forward. When Mr. Nichols asked why he was being handcuffed, he was given two simultaneous answers: (1) "because you don't want to listen" and (2) "because you were getting out of your car when we wanted to talk to you." These responses indicate that Mr. Nichols was not free get out of his truck—much less to leave.

The court realizes officers have a legitimate need to maintain the status quo during traffic stops to preserve officer safety. But the officers' immediate decision to handcuff Mr. Nichols when he was leaving his truck set the tone for a police-dominated encounter. And their actions continued to indicate that they dominated the encounter. Officers used stern tones and ordered Mr. Nichols to stop moving while they searched him. And once he was searched, Mr. Nichols was told to sit on the curb. He was not allowed to move.

While Mr. Nichols sat on the curb, five officers were near him and his truck. Two of the officers stood directly over him. And those two officers were asking him questions. When Mr. Nichols wouldn't answer a question, the officers asked the question again in a different way. All

16

of these police actions created a coercive and police-dominated environment.  For those reasons,

a reasonable person would not feel free to leave or stop answering questions, and so the court

finds that Mr. Nichols was in custody.

### 2.    Interrogation

The second step in the *Miranda* analysis asks whether the police interrogated Mr.

Nichols.  The term "interrogation" in this context refers to "express questioning" or "words or

actions on the part of the police (other than those normally attendant to arrest and custody) that

the police should know are reasonably likely to elicit an incriminating response from the

suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  While the officer's intent is not

irrelevant to the inquiry, the courts look to whether a reasonable officer would foresee that his

questions or conduct would elicit an incriminating response.  *Id.* at 300–02.  These questions

become the functional equivalent of expressly questioning a person about their criminal liability.

*Id.*

The government argues that the officers asked questions for officer safety reasons—not

to illicit incriminating responses.  During a traffic stop, for officer safety, officers may ask

whether there are loaded weapons in the vehicle.  *United States v. Wilson*, 96 F. App'x 640, 645

(10th Cir. 2004) (citing *United States v. Holt*, 264 F.3d 1215, 1221–25 (10th Cir. 2001) (en

banc)).  The government asserts that the officers were concerned for their safety because of Mr.

Nichols's erratic behavior.  So, the argument goes, if there were weapons in the truck and Mr.

Nichols broke free of officer control, two weapons posed a threat to officers.  Thus, the officers'

questions about weapons in the truck were designed to ensure their safety while obtaining more

information from Mr. Nichols.

17

But there is a problem with the government's argument.  It does not match the facts of the case.  The first question about whether there were guns inside the truck came while Mr. Nichols was seated on the curb and in handcuffs.  Two officers were standing directly over him and three more were present.  It was not reasonable under these circumstances to fear that Mr. Nichols might break free and gain control of a gun in the truck.

But more importantly, the officers did not just ask if there were weapons in the truck. That was just the first question in a line of questions.  And when that question did not produce a response, Officer Jones began asking more subtle questions: "Bruce, It's just an expired tag, man, what is there to be upset about?" And, "what do you think you're going back for?"  Mr. Nichols responded that there were things in the truck that belong to his father, but Mr. Nichols was not supposed to be around them.  Officer Jones then asked Mr. Nichols if he was talking about firearms or drugs.   This follow up question was not confined to firearms, making it clear that Officer Jones was concerned about more than officer safety.  Officer Jones began by asking open-ended questions.  And when he got a response that could be incriminating, he asked a specific question:  Guns or drugs?  Officer Jones, at the least, should have known that his questions were reasonably likely to elicit incriminating responses from Mr. Nichols.

The officers should have known their questions were reasonably likely to elicit an incriminating response from Mr. Nichols.  The police thus interrogated Mr. Nichols while in custody.  For that reason, *Miranda* required the officers to inform Mr. Nichols of his rights. Because they did not, the court suppresses evidence of the incriminating statements elicited by officers during the interrogation.

### III.    Conclusion

In sum, officers had probable cause to arrest Mr. Nichols, allowing them to search the container, which, in turn, gave them probable cause to search the truck.  The court thus denies the part of Mr. Nichols's motion that seeks to suppress evidence derived during the seizure and searches.  But Topeka Police officers conducted custodial interrogation without informing Mr. Nichols of his *Miranda* rights.  For that reason, the court grants the part of Mr. Nichols's motion that seeks to suppress evidence of incriminating statements obtained before *Miranda* warnings were given.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Nichols's Motion to Suppress (Doc. 17) is denied in part and granted in part.

**IT IS SO ORDERED.**

**Dated this 22nd day of January, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**